**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:21-cv-00445-CJN |
| v. | ) ) | Judge Carl J. Nichols |
| MY PILLOW, INC. and MICHAEL J. LINDELL, | ) ) ) | |
| Defendants. | ) ) | |

## <u>DEFENDANT MY PILLOW, INC'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION TO DISMISS</u>

**LEWIN & LEWIN, LLP**
Nathan Lewin (D.C. Bar No. 38299)
888 17th Street NW
Fourth Floor
Washington, DC 20006
Telephone: (202) 828-1000
nat@lewinlewin.com

*Counsel for Defendant My Pillow, Inc.*

Alan Dershowitz (MA Bar No. 121200)
1575 Massachusetts Avenue
Cambridge, MA 02138

*Of Counsel for Defendant My Pillow, Inc.*

**PARKER DANIELS KIBORT LLC**
Andrew D. Parker (MN Bar No. 195042)*
Joseph A. Pull (D.C. Bar No. 982468)
Gregory N. Arenson (MN Bar No. 398276)*
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
Telephone: (612) 355-4100
parker@parkerdk.com
pull@parkerdk.com
arenson@parkerdk.com

* Admitted *Pro Hac Vice*

*Counsel for Defendant My Pillow, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION.................................................................................................... 1

I.   THE COMPLAINT MUST BE DISMISSED BECAUSE ITS ACTUAL-MALICE ALLEGATIONS ARE INSUFFICIENT UNDER *NEW YORK TIMES v. SULLIVAN* ............................................................................................................... 2

    A.   The Court May Take Judicial Notice of Publications Showing Public Debate Over Integrity of the 2020 Election. .................................................. 3

    B.   Dominion's Lawsuit Seeks to Stifle Core First Amendment Debate. ............. 4

    C.   "Inherently Improbable" Does Not Substitute for a Plausible Allegation of Actual Malice........................................................................................ 6

    D.   "Preconceived Narrative" Cannot Substitute for a Plausible Allegation of Actual Malice........................................................................................ 8

    E.   Attacks on the Credibility of Lindell's Sources Do Not Substitute for a Plausible Allegation of Actual Malice. ..................................................... 10

    F.   Refusal To Retract Cannot Substitute for a Plausible Allegation of Actual Malice. .................................................................................................. 11

II.  DOMINION IS A PUBLIC FIGURE AND ITS DEFAMATION LAWSUIT IS GOVERNED BY *NEW YORK TIMES v. SULLIVAN* ................................... 13

    A.   Dominion's Role in the 2020 Presidential Election Is "Official Conduct" at the Heart of *New York Times v. Sullivan.* ............................................... 13

    B.   Dominion Became a Public Figure by Thrusting Itself into Public Debate Over the Integrity of the 2020 Presidential Election. ...................... 14

III. DOMINION DOES NOT PLEAD ANY BASIS TO HOLD MYPILLOW RESPONSIBLE FOR THE STATEMENTS BY LINDELL ALLEGED IN THE COMPLAINT.................................................................................................. 15

IV.  ENFORCEMENT OF *NEW YORK TIMES v. SULLIVAN* REQUIRES IMMEDIATE DISMISSAL OF AN INSUFFICIENT COMPLAINT UNDER RULE 12(b)(6) ....................................................................................................... 18

V.   MYPILLOW'S SCANT ACTIVITY WITHIN THE DISTRICT OF COLUMBIA PROVIDES NO BASIS FOR THIS COURT TO EXERCISE JURISDICTION. ... 19

    A.   The District of Columbia Long-Arm Statute Does Not Confer Jurisdiction. 19

**B.** **Due Process Bars D.C. Jurisdiction over Dominion's Claims Against MyPillow.** ........................................................................................... **23**

**VI.** **THE DISTRICT OF COLUMBIA IS NOT THE PROPER VENUE FOR A DISPUTE BETWEEN A MINNESOTA PILLOW MANUFACTURER AND A COLORADO ELECTION-SERVICE PROVIDER** .................................................. **24**

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) ....................................... 3

*Anwar v. Dow Chem. Co.*, 876 F.3d 841, 853 (6th Cir. 2017) ..................................................... 22

*Arpaio v. Cottle*, 404 F. Supp.3d 80, 85 (D.D.C. 2019) ................................................................ 4

\* *Arpaio v. Zucker*, 414 F. Supp.3d 84, 91 (D.D.C. 2019) ............................................................ 18

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ............................................................................... 16

\* *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003)............................................................... 20

*Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015)................................................................ 18

*Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp.3d 149, 175 (D.D.C. 2017) ............... 16

\* *Brentwood Acad. v. Tenn. Sec. Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)........................... 13

*Brunson v. Kalil & Co.*, 404 F. Supp.2d 221, 228 (D.D.C. 2005)............................................... 20

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).................................................. 23, 24

*Burman v. Phoenix Worldwide Indus., Inc.*, 437 F. Supp.2d 142, 153 (D.D.C. 2006)................ 22

*C.S.B. Commods., Inc. v. Urban Trend (HK) Ltd.,* 626 F. Supp.2d 837, 853 (N.D. Ill. 2009)..... 20

\* *Citadel Inv. Grp., L.L.C. v. Citadel Cap. Co.,* 699 F. Supp.2d 303, 310 (D.D.C. 2010)............. 20

*Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp.3d 158, 190 (D.D.C. 2018)........ 25

\* *Curling v. Raffensberger*, 493 F. Supp.3d at 1278, 1342 (N.D. Ga. 2020) ...................... 5, 6, 12

*Dean v. Am. Fed'n of Gov't Emps.*, 509 F.Supp.2d 39, 58 (D.D.C. 2007)................................... 15

*Deripaska v. Associated Press*, 282 F. Supp.3d 133, 140 (D.D.C. 2017) ..................................... 4

\* *Fairbanks v. Roller*, 314 F. Supp.3d 85, 92 (D.D.C. 2018)..................................................... 18

\* *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ........................................... 3, 19

*Fiorentine v. Sarton P.R., LLC*, 486 F. Supp.3d 377, 385 (D.D.C. 2020)................................... 23

*Fisher v. Bander*, 519 A.2d 162 (D.C. 1986) .............................................................................. 19

*Flowers v. Carville*, 310 F.3d 1118, 1122, 1126 (9th Cir. 2002) ................................................ 12

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021)............ 20, 21

*Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140 (4th Cir. 2018) .................................. 18

*Gertz v. Robert Welch, Inc.*, 680 F.2d 527 (7th Cir. 1982)............................................................ 9

*Gilmore v. Jones*, 370 F. Supp.3d 630, 673 (W.D. Va. 2019) ...................................................... 9

*Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969).................................................................... 9

*Gottwald v. Sebert*, 2021 WL 1567070 (N.Y. App. Div. 1st Dep't, Apr. 22, 2021) ................... 15

*Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1051, 934 P.2d 121, 132 (1997)......................... 20

*Greenberg v. CBS, Inc.*, 69 A.D.2d 693, 419 N.Y.S.2d 988 (2d Dep't 1979)............................. 15

*GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C.Cir. 2000)............. 23

*GTSI Corp. v. Wildflower Int'l, Inc.*, 2009 WL 10687969 (E.D. Va. Nov. 17, 2009)................. 14

*Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ............................................................................ 23

*Harris v. City of Seattle*, 152 Fed. Appx. 565 (9th Cir. 2005)...................................................... 9

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 691 n. 37 (1989) ............... 11

*Hutchinson v. Proxmire*, 443 U.S. 111, 135-36 (1979) ............................................................... 19

*IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp.3d 95, 110-11 (D.D.C. 2018) ...................... 20, 21

*In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp.3d 46, 72 (D.D.C. 2016) .................. 4

\* *Jankovic v. International Crisis Group*, 822 F.3d 576, 597 (D.C. Cir. 2016) ................................ 8

\* *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp.2d 119, 134 & n.6 (D.D.C. 2004)...... 17, 20, 22

*Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) ................................ 18, 19

*Lawrence v. Bauer Pub. & Printing Ltd.*, 459 U.S. 999 (1982) ............................................... 19

*Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 26 (1st Cir. 2018) .................................................... 18

*Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp.2d 116 (D.D.C. 2010) ...................................... 21

*Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003) ...................................................... 11

*Maryland Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp.3d 80, 91 (D.D.C. 2019) ........... 23

*Matson v. Dvorak*, 40 Cal. App. 4th 539, 549, 46 Cal. Rptr. 2d 880, 886-87 (1995)................. 20

*McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020).......................... 18

*McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1513 (D.C. Cir. 1996) ............... 10, 11

*Menoken v. Dhillon*, 975 F.3d 1, 8 (D.C. Cir. 2020) .................................................................. 4

\* *Mirage Ent., Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp.3d 26, 36 (S.D.N.Y. 2018).......... 18

\* *New York Times v. Sullivan*, 376 U.S. 254 (1964)................................................................ passim

*Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) ........................................................ 9

*Parsi v. Daioleslam*, 890 F. Supp.2d 77, 89 (D.D.C. 2012) ....................................................... 3

*Perlmutter v. Varone*, 59 F. Supp.3d 107, 110 (D.D.C. 2014)................................................... 25

*Phillips v. Mabus*, 894 F. Supp.2d 71 (D.D.C. 2012)................................................................. 14

\* *Preservation Soc. of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp.2d 49, 53 (D.D.C. 2012).................................................................................................................... 24, 25

*Project Veritas v. New York Times Co.*, No. 63921/2020 (N.Y. Sup. Ct. Mar. 18, 2021) ............ 9

*Quality Air Servs., L.L.C. v. Milwaukee Valve Co.*, 567 F. Supp.2d 96 (D.D.C. 2008)............... 20

*Seltzer v. I.C. Optics, Ltd.*, 339 F. Supp.2d 601, 611 (D.N.J. 2004)........................................... 22

*Shoppers Food Warehouse v. Moreno*, 746 A.2d 320 (D.C. 2000)............................................. 21

*St. Amant v. Thompson*, 390 U.S. 727 (1968).................................................................... 7, 10

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1138 (9th Cir. 2003)..... 12

\* *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 242 (D.C. Cir. 2021)...................... passim

*United States v. Bestfoods*, 524 U.S. 51, 69 (1998) .................................................................. 17

*United States v. Schwimmer*, 279 U.S. 644, 654-655 (1929)...................................................... 1

\* *Vogel v. W. Mountain Corp.*, 97 A.D.2d 46, 47–48, 470 N.Y.S.2d 475, 476 (3d Dep't 1983).... 20

\* *Wash. Gas-Light Co. v. Lansden*, 172 U.S. 534, 546 (1899)..................................................... 15

*Washington Post v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966)................................................. 19

*Zerangue v. TSP Newspapers, Inc.* ........................................................................................ 11

*Zimmerman v. Al Jazeera America, LLC*, 246 F. Supp.3d 257, 270, 284 (D.D.C. 2017) ............. 4

**Statutes**

D.C. Code § 13-423(a)(1) ................................................................................................. 20, 21

D.C. Code § 13-423(a)(3) ...................................................................................................... 21

D.C. Code § 13-423(a)(4) ................................................................................................. 21, 22

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 18, 25

## <u>INTRODUCTION</u>

Robust and often angry debate over public issues abounds in American history. The courts have rightfully rejected efforts to use lawsuits to silence one side in these debates. American judges have historically guaranteed the right to express unpopular opinions. Justice Oliver Wendell Holmes famously observed, "[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought – not free thought for those who agree with us but freedom for the thought that we hate." *United States v. Schwimmer*, 279 U.S. 644, 654-655 (1929). America's judiciary has fortified that principle by applying the First Amendment to forbid prior restraint, protect access to public forums, and deprive government of authority to punish speech unless it presents a clear and present danger of actual physical harm. These guarantees shielded the citizens who campaigned to abolish slavery, those who opposed powerful monopolistic trusts, and those who fought discrimination against women.

Dominion's defamation lawsuit is a novel effort to silence criticism of the performance of governmental functions by suppressing facts and arguments in the ongoing debate over the reliability of the 2020 election results. Dominion has spent obscene amounts of money to haul its critics to court, knowing that if the lawsuits drag on, regardless of their outcome, Dominion's critics will be forced to squander enormous resources to avoid crippling monetary judgments. This achieves Dominion's goal – to chill its critics into silence.

Enemies of the NAACP tried this tactic to silence the NAACP's demands for racial equality. In response, to prevent speakers from being silenced, the Supreme Court erected a constitutional wall to protect public criticism of government officials and others who voluntarily assume a public role: *New York Times v. Sullivan*, 376 U.S. 254 (1964).

1

This landmark precedent is nullified if, as Dominion claims (Opp. at 4), *New York Times v. Sullivan* protects only against **collection** of a devastating monetary judgment but permits, at enormous cost to the defendant, plenary litigation of claims designed to silence the defendant's criticism of a public figure. The Constitution can effectively shield honestly held criticism of public figures only if courtroom doors are promptly shut to those who, like Dominion, wield a lawsuit as a silencer.

## I.

## THE COMPLAINT MUST BE DISMISSED BECAUSE ITS ACTUAL-MALICE ALLEGATIONS ARE INSUFFICIENT UNDER *NEW YORK TIMES v. SULLIVAN*

Dominion's complaint faces – and fails to surmount – a vital pleading hurdle. It must allege that Mike Lindell acted with "actual malice" – that he made deliberately false statements in taking one side of a pervasive, cacophonous public debate over whether Dominion products used by state and local governments to count votes were compromised and affected the 2020 election result.[1]

Millions of Americans share Lindell's beliefs, and many credible American voices support the opinions expressed by Lindell both before and after the election.

Dominion's Opposition tries to plead "actual malice" without alleging a single act or statement by Lindell that demonstrates subjective knowledge that his statements were false or that he said them with reckless disregard of their alleged falsity. The paragraphs Dominion enumerates on page 8 of its Opposition as pleading "actual malice" fail to do so.

- Paragraphs 2-3, 33, 40, 42, 59, 63, 69,71, 101, 114, 129, and 160 of Dominion's complaint allege that Lindell's statements were contradicted. But disagreement in a political

---

[1] Changing the allocation of electoral votes from just three states in various combinations would have resulted in Candidate Trump being declared the winner rather than Candidate Biden. In one of those three-state combinations – Arizona, Georgia, Wisconsin – the total vote differential between the two candidates was approximately 40,000.

controversy, even from a credible voice, is not proof of deliberate falsity. *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 242 (D.C. Cir. 2021) (publisher "need not accept denials, however vehement"); *Parsi v. Daioleslam*, 890 F. Supp.2d 77, 89 (D.D.C. 2012) ("mere fact that [editor] and defendant disagreed to some extent about the factual support for the article does not indicate actual malice.").

- Paragraphs 4, 38, 43, 49, 72-76, 79, 84, 91, 116, 120, 123-124, 126, and 164 allege that Lindell relied on unreliable evidence or people. Adversaries in a political dispute routinely differ over the reliability of their sources of information. Neither is guilty of deliberate falsehood or recklessness because its reliance is allegedly misplaced.

- Paragraphs 1, 34-35, 44, 70, 93, 102, 104, and 161 allege that Lindell's statements were part of a deliberate campaign to market MyPillow products. They include no plausible allegation of any corporate statement or endorsement by MyPillow of any statement by Lindell. Nor is there any allegation of MyPillow authorizing Lindell to initiate or conduct such a commercial campaign.

- Paragraphs 50-51, 56, 64-65, 96, 98, 103, 105, 110-113, 115, 125, 127, 130-131 do no more than identify allegedly defamatory statements. Paragraphs 92 and 99 criticize third parties like Newsmax, but are not relevant to Dominion's claims against MyPillow.

**A. The Court May Take Judicial Notice of Publications Showing Public Debate Over Integrity of the 2020 Election.**

"In determining whether a complaint states a claim, the court may consider . . . matters of which it may take judicial notice." *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). Articles concerning the subject-matter of a defamation plaintiff's claims are relevant in determining whether the complaint alleges actual malice. *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("Judicial notice is properly taken of publicly available historical articles

such as were attached to *Esquire*'s motions to dismiss."); *Arpaio v. Cottle*, 404 F. Supp.3d 80, 85 (D.D.C. 2019); *Deripaska v. Associated Press*, 282 F. Supp.3d 133, 140 (D.D.C. 2017).

MyPillow's motion does not, as Dominion charges, ask this Court to "accept the truth of statements in documents outside the pleadings" or "draw inferences and resolve factual disputes in Defendants' favor." Opp. at 9-10. MyPillow's citations prove only an irrefutable fact – that voting machine integrity in the 2020 election is a widely and hotly debated topic. The Court need not address the truth of these reports to conclude that Lindell's statements were made during a broad and deep public debate.

The precedents cited by Dominion rejected requests that a court accept the truth of extra-record publications. In *Menoken v. Dhillon*, 975 F.3d 1, 8 (D.C. Cir. 2020), an employment case, the defendant sought to dismiss a complaint based on the truth of extraneous documents. In *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp.3d 46, 72 (D.D.C. 2016), the defendants asked the court to "make factual determinations" from additional documents. In *Zimmerman v. Al Jazeera America, LLC*, 246 F. Supp.3d 257, 270, 284 (D.D.C. 2017), the defendant relied on a source that had given an "unequivocal recantation" of his claims.

When a defamation action concerns matters of public debate, taking notice of public support of ***both sides*** – rather than limiting the Court's view to only selected expressions that support the plaintiff's claims of recklessness – is necessary. Otherwise, a wily plaintiff can extinguish the protection of *New York Times v. Sullivan* by strategically omitting in the complaint any reference to public sources that endorse the defendant's statements.

**B.   Dominion's Lawsuit Seeks to Stifle Core First Amendment Debate.**

The "actual malice" standard is meaningless if it provides so little protection to free speech that courts may declare one side of a contentious political debate to be so unhinged, crazy, and beyond the pale that its sincere advocates are legally condemned as slanderers.

Dominion is legally entitled to disagree with the views expressed by Lindell even if that means it disagrees with the 51% of American voters who apparently share Lindell's opinion.[2] The fact that this contentious debate **exists** refutes Dominion's claim that no one in their right mind could believe what Lindell believes. Similar views have been expressed by Senators,[3] expert witnesses giving sworn testimony in federal court;[4] state legislators[5] and voting machine certification officials[6] in the performance of their duties. Even then-Senator Kamala Harris may be included in this roster.[7] Moreover, Lindell's statements echo accusations made four years ago, when many Americans believed that Russia interfered in the 2016 presidential election.

The importance of open and robust discussion about election integrity is illustrated even by the shifting assessments of election security experts cited by Dominion. Dominion's complaint alleges that Harri Hursti and J. Alex Halderman, along with other cybersecurity experts, expressed the view in mid-November 2020 that the election was not "altered through technical compromise."[8] A few weeks earlier, Hursti testified that in his "professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system."[9] Halderman sounded a similar alarm in the wake of "Russia-gate" when he testified

---

[2] RASMUSSEN REPORTS, *Election Integrity: 62% Don't Think Voter ID Laws Discriminate* (April 13, 2021), https://www.rasmussenreports.com/public_content/general_politics/april_2021/election_integrity_62_don_t_think_voter_id_laws_discriminate.
[3] Mem. in Supp. of Def. My Pillow, Inc.'s Mot. to Dismiss, Appx. § I.4, ECF No. 30-1.
[4] *Curling v. Raffensperger*, 493 F. Supp.3d 1264, 1279-83, 1287-89 (N.D. Ga. 2020)
[5] Mem. in Supp. of Def. Lindell's Mot. to Dismiss 18, ECF No. 34-1 (citing ECF No. 34-2 at 427-428, 430, 432).
[6] Mem. in Supp. of Def. My Pillow, Inc.'s Mot. to Dismiss, Appx. § I.4, 15, 16, ECF No. 30-1.
[7] *See* https://www.washingtonpost.com/politics/2020/08/12/cybersecurity-202-kamala-harris-brings-record-fighting-election-security-democratic-ticket/; https://www.washingtonexaminer.com/news/kamala-harris-russian-interference-could-cost-us-the-election.
[8] Compl., ¶ 41(b).
[9] Exs. in Supp. of Def. Lindell's Mot. to Dismiss 42, ECF No. 34-2.

before the Senate Intelligence Committee that "our highly computerized election infrastructure is vulnerable to sabotage, and to cyberattacks that could change votes."[10] Lindell heeded these warnings, as did a federal judge in the Northern District of Georgia who cautioned after receiving testimony that the "huge volume of significant evidence regarding the security risks and deficits" suggest "that this is not a question of 'might this actually ever happen?' – but 'when it will happen,' especially if further protective measures are not taken." *Curling v. Raffensberger*, 493 F. Supp.3d at 1278, 1342 (N.D. Ga. 2020).

Constitutional protection cannot depend on whether a speaker accepted Hursti's public statements of August 2020 rather than his public statements in November 2020. Grave and shifting concern about our nation's election integrity expressed by Senators, state legislatures, experts, courts, reporters, and voters cannot be resolved by the judiciary. Our constitutional order encourages free and open debate on this subject of national importance. By suing MyPillow – no more than a manufacturer identified with one of the debaters – Dominion tries to muzzle the discussion. Two bedrock principles are at stake – freedom of speech and election integrity. Dominion's effort to deny one and distort the other must be rejected.

Dominion argues that (a) the substance of Lindell's statements is "inherently improbable," (b) the statements express a "preconceived narrative," and (c) Lindell refused to retract when Dominion objected. None of these is a legal substitute for the required affirmative proof of malice.

## C. **"Inherently Improbable" Does Not Substitute for a Plausible Allegation of Actual Malice.**

The constitutional protection conferred by *New York Times v. Sullivan* is illusory if a public-figure plaintiff may sue a critic for defamation and compel discovery and trial by alleging

---

[10] *Prof. J. Alex Halderman testifies in front of senate intelligence committee on secure elections* (June 26, 2017), https://cse.engin.umich.edu/stories/prof-j-alex-halderman-testifies-in-front-of-senate-intelligence-committee-on-secure-elections.

only that the critic's statement is "inherently improbable."  No judicial precedent supports such facile evasion of the shield that the Supreme Court provided for criticism of how public business is conducted. Dominion cites only one case to support that contention – *St. Amant v. Thompson*, 390 U.S. 727 (1968). Opp. at 9. *St. Amant* actually held that the defendant's statement was not "a reckless publication about a public officer," reversing a judgment against him. 390 U.S. at 732. Justice White's opinion cautiously contrasted the facts of that case with publication that might be deemed reckless – if a "story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." *Id.*

Lindell's criticism of Dominion is far from Justice White's hypotheticals. Dominion's own description of Lindell's accusations – that "Dominion committed election fraud" and that its conduct was "part of a vast international conspiracy" – are supported by multiple public events and announcements. The public controversy regarding the integrity of how votes were tallied distances this case from the kind of dispute that *New York Times* and *St. Amant* permit a court to resolve in a defamation lawsuit. It is not the ***truth*** of the materials cited at pages 2-3 and 15-17 of MyPillow's opening memorandum (ECF No. 30-1), but their ***public dissemination*** that establishes that Lindell's statements cannot be deemed "inherently improbable."

The "inherently improbable" standard is, in addition, an unacceptable judicial measure because "probability" is a moving target. What seems "inherently improbable" today may become common knowledge tomorrow. It was once thought "inherently improbable" that the earth is round or that humans would ever fly or explore the moon. The possibility that the Covid-19 virus escaped from a research lab in China was "inherently improbable" in 2020 but is no longer "inherently improbable" in mid-2021. A view on a subject of vigorous public debate cannot be deemed knowingly false today because a plaintiff alleges – and even if a judge believes – that it is

"inherently improbable." In his renowned 1944 "Spirit of Liberty" address Judge Learned Hand said, "The spirit of liberty is the spirit which is not too sure that it is right."

Dominion acknowledges that it has been reported that "more than half of Americans now believe that cheating likely affected the outcome of the election." Opp. at 10. How, then, can it contend that Lindell's declarations are "inherently improbable"? In light of the ongoing public discussion concerning the integrity of the 2020 election and the intrinsic fluidity of an "improbability" standard, an allegation of "inherent improbability" does not dent the constitutional shield afforded MyPillow by *New York Times v. Sullivan*.

### D. "Preconceived Narrative" Cannot Substitute for a Plausible Allegation of Actual Malice.

The Court of Appeals for the District of Columbia Circuit recently held the "preconceived narrative" allegation insufficient to carry a defamation complaint over the hurdle of pleading actual malice. "Our court, however, has made clear that 'preconceived notions' or 'suspicion[s]' usually do 'little to show actual malice.'" *Tah*, 991 F.3d at 241 (citing *Jankovic v. International Crisis Group*, 822 F.3d 576, 597 (D.C. Cir. 2016)). The *Tah* defendants disseminated their "narrative" in private correspondence before publishing it, but the Court of Appeals nonetheless refused to credit the assertion that malice was adequately alleged because the supposedly defamatory statement was "preconceived." The Court explained that "concoct[ing] a pre-conceived storyline by itself is not antithetical to the truthful presentation of facts." *Id*. (quotations omitted). Moreover, in Lindell's case the "preconceived narrative" contention has no substance whatever. Dominion alleges only speculation that Lindell had a preconceived narrative, with no supporting plausible fact.

Dominion quotes out-of-context language from a series of precedents which, it contends, support its claim that actual malice may be inferred from a finding that the speaker had a "preconceived" plan. Opp. at 7, 16-17. In the cases cited by Dominion the court either rejected the

8

"preconceived narrative" contention altogether or held that the complaint also plausibly alleged some speech or conduct by the defendant that manifested subjective knowledge or reckless disregard of the truth. See *Harris v. City of Seattle*, 152 Fed. Appx. 565 (9th Cir. 2005) (judgment for defendant affirmed); *Gertz v. Robert Welch, Inc.*, 680 F.2d 527 (7th Cir. 1982) (actual malice shown by editor's deliberate selection of hostile author, inadequate hasty editing, and "slipshod and sketchy investigatory techniques"); *Palin v. New York Times Co.,* 940 F.3d 804 (2d Cir. 2019) (actual malice shown by allegation of speaker's personal motive and bias, speaker's disregard of published contrary articles and article connected to draft); *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969) (actual malice shown by misleading editing of questionnaire responses from psychiatrists and deliberate omission of contradictory material); *Gilmore v. Jones*, 370 F. Supp.3d 630, 673 (W.D. Va. 2019) (acknowledging that "neither the pursuit of a preconceived narrative nor a failure to observe journalistic standards is alone ultimately enough to establish actual malice," but finding totality of allegations sufficient).

Dominion also cites a New York state trial court decision, *Project Veritas v. New York Times Co.*, No. 63921/2020 (N.Y. Sup. Ct. Mar. 18, 2021), Opp. at 17, but the language Dominion quotes from this opinion is misleading because it is merely the court's recitation of what "Veritas argues," followed by material copied from the Veritas brief (*see* Pl.'s Mem. of Law in Opp. to Defs.' Mot. to Dismiss, 2021 WL 2031843 (Feb. 1, 2021)) with no endorsement or approval by the court. The court's legal analysis neither adopts nor approves this argument but states, "Veritas alleged actual malice by providing facts sufficient to demonstrate Defendants' alleged disregard for the truthfulness of its statements." *Veritas*, No. 63921/2020, at 15.

### E. <u>Attacks on the Credibility of Lindell's Sources Do Not Substitute for a Plausible Allegation of Actual Malice.</u>

Dominion argues at length that Lindell spoke with actual malice because Dominion and others believe that the sources of Lindell's information are not credible. Opp. 12-16. The test for actual malice, however, does not ask whether "a reasonably prudent man would have published, or would have investigated before publishing," but rather whether "the defendant in fact entertained serious doubts as to the truth." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). "Serious doubts as to the truth" cannot be inferred from an allegation that the defendant's statements concerning a publicly debated issue were challenged as "unreliable" by the defendant's adversaries. "[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. at 270. Dominion nowhere pleads any plausible basis to conclude Lindell harbored "subjective doubt" as to the character or methods of Russell Ramsland, Mary Fanning, General Thomas McInerney, or anyone else on whom he relied.

Moreover, much published information contradicts Dominion's view of the 2020 election.[11] The extensive network of data that supports Lindell's statements renders Dominion's reliance on cherry-picked contrary views inadequate as proof of actual malice. *Cf. McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1513 (D.C. Cir. 1996) ("Schaap had reason to be wary of Ben–Menashe, but he also had some reason to believe the story"). Millions of Americans accept Lindell's information and sources as reliable. In a publicly debated controversy over a public election, the First Amendment does not permit half of an almost evenly divided country to use a

---

[11] See Part I.B above and Appx. to Mem. in Supp. of Def. My Pillow, Inc.'s Mot. to Dismiss, ECF No. 30-1.

defamation action to beat the other half into silence by alleging in a pleading that its information is more credible.

A defamation plaintiff does not satisfy the constitutional actual malice requirement by challenging the credibility of the speaker's sources. If a defamation plaintiff could prevail by convincing a judge that the plaintiff's information is more credible, *New York Times v. Sullivan* would provide no protection for critics of public officials. Obligating a defamation defendant to corroborate its sources "would be to turn the inquiry away from the publisher's state of mind and to inquire instead whether the publisher satisfied an objective standard of care." *McFarlane*, 91 F.3d at 1509. That is not the law.

### F.  Refusal To Retract Cannot Substitute for a Plausible Allegation of Actual Malice.

In its *Tah* opinion, the Court of Appeals forcefully rejected the relevance of a speaker's refusal to retract in considering whether an allegedly defamatory statement was uttered with actual malice: "A publisher 'need not accept "denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error."'" 991 F.3d at 242, quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003), which quoted *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 691 n. 37 (1989). Lindell justifiably refused to comply with Dominion's demands that he retract his accusations. He continues to stand by them.

Dominion misleadingly cites a Fifth Circuit decision to support its assertion that "a defendant's refusal to retract is also evidence of actual malice." Opp. at 7. In fact, *Zerangue v. TSP Newspapers, Inc.* says: "Refusal to retract an ***exposed error*** tends to support a finding of actual malice. Conversely, a readiness to retract tends to negate 'actual malice.'" 814 F.2d 1066, 1071 (5th Cir. 1987) (citations omitted; emphasis added.). Lindell's accusation against Dominion has not been exposed as an error. It was, and remains, true. Moreover, *Zerangue* said that refusal to

retract even an "exposed" error only "tended" to support a finding of malice. No authority approves finding malice from a refusal to retract with no other evidence of subjective knowledge of falsity or reckless disregard of truth.

In *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1138 (9th Cir. 2003), the Ninth Circuit held that disagreement over vehicle testing procedures could not demonstrate "purposeful avoidance of critical facts." *Flowers v. Carville,* 310 F.3d 1118, 1122, 1126 (9th Cir. 2002), also cited by Dominion, concerned a memoir referring to possibly erroneous news reports long after the reports had been published. The defendant was not a private citizen expressing a view shared by half the country on an issue of great public importance.

Dominion suggests that rejection of a series of pre-suit letters to Lindell and to Sidney Powell could prove actual malice. Opp. at 13. The letters were directed to Lindell personally and not to MyPillow. They reflect little interest by Dominion in illuminating facts or changing minds. The December 23, 2020, letter (Compl. ¶ 63) is a garden-variety litigation document preservation notice. The "formal retraction" letter of January 8, 2021, only identifies purported "evidence" that no fraud or misconduct had occurred in Georgia or Arizona. It conflicts with the Arizona Senate's decision to audit Maricopa County's 2020 election results[12] and with the indications of flaws in Georgia's voting system that have appeared in media[13] and in a federal court decision. *Curling v. Raffensberger*, 493 F. Supp.3d at 1341.

Dominion's February 4, 2021, letter concluded, "We have no doubt that you will purposefully avoid this opportunity because you are not actually interested in the truth and—as

---

[12] Press Release*,* Ariz. Sen. Republicans, Ariz. Sen. hires auditor to review 2020 election in Maricopa County (March 31, 2021), https://www.azsenaterepublicans.com/post/arizona-senate-hires-auditor-to-review-2020-election-in-maricopa-county.

[13] Mem. in Supp. of Def. Lindell's Mot. to Dismiss 26, ECF No. 34-1 (citing ECF No. 34-2 at 312-13).

you told CBS News—you want Dominion to sue you."   Compl. Ex. 314. Dominion cites no

authority to support a conclusion that such a communication should have evoked a subjective

doubt in Lindell – or in his employer – as to the truth of the beliefs he expressed. The letters reflect

the scenario the *Tah* court envisioned when it observed that a publisher "need not accept denials,

however vehement." 991 F.3d at 242. They merely confirmed that Dominion took a different view

of the evidence than did Lindell. The letters did not obligate Lindell to agree with Dominion. Nor

did they arouse the "subjective doubt" that Dominion must plausibly allege to satisfy the *New York*

*Times v. Sullivan* standard.

## II.

## DOMINION IS A PUBLIC FIGURE AND ITS DEFAMATION LAWSUIT IS GOVERNED BY *NEW YORK TIMES v. SULLIVAN*

### A. <u>Dominion's Role in the 2020 Presidential Election Is "Official Conduct" at the Heart of *New York Times v. Sullivan.*</u>

Dominion now modestly asserts that it was only a "government contractor" (Opp. at 4-5),

a striking contrast with its allegations that it has contracts to provide "voting systems and services

in a majority of states across the country," ranging from "tens of thousands of dollars to over a

hundred million dollars," that are "historically . . . long term with high renewal rates." Compl.

¶ 157. Dominion is hardly the lilliputian technocrat that it now professes to be. The voting systems

and services it provides in a majority of states make it a key part of the electoral process, no

different from a hypothetical public official who hires and oversees people to collect, tabulate, and

report votes. Dominion fulfills this role by providing its employees and equipment. Dominion is a

public official by virtue of performing duties that would normally be performed by public officials.

*See Brentwood Acad. v. Tenn. Sec. Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) ("nominally

private entity" is "state actor" when "it has been delegated a public function by the State").

The Supreme Court's core objective in *New York Times v. Sullivan* was to erect a constitutional shield for "criticism of official conduct" performed by "public officials." *See* 376 U.S. at 279-83. Dominion was, in every practical sense, a "public official" counting votes in the 2020 Presidential election, and Lindell's public accusations are precisely the "criticism of official conduct" that the First Amendment, as interpreted by the Supreme Court, protects.

The two precedents Dominion cites (Opp. at 4) as proof that a government contractor may bring a defamation lawsuit involve neither "public officials" nor "criticism of official conduct." In *Phillips v. Mabus*, 894 F. Supp.2d 71 (D.D.C. 2012), a private firm claimed it was falsely accused of criminal acts – double and triple billing. The defendants' statements (concerning private billings) were not "criticism of official conduct" and the plaintiffs (a firm contracting naval architecture services and its owner) were not "public officials." *GTSI Corp. v. Wildflower Int'l, Inc.*, 2009 WL 10687969 (E.D. Va. Nov. 17, 2009), was a lawsuit between two competing government contractors. The plaintiff alleged that the defendant falsely accused a "disgruntled" employee of the plaintiff of leaking a document to the government. The alleged defamatory statement was not "criticism of official conduct," and the plaintiffs were not "public officials" whose right to sue is limited by the constitutional protection of *New York Times v. Sullivan.*

Dominion curiously cites an opinion of Justice Thomas to support its claim that the actual malice standard "should not apply even to public officials." Opp. at 4. Dominion certainly knows that this is not the law. Its defamation claim is governed by the principles of *New York Times v. Sullivan* applicable to "criticism of official conduct" performed by Dominion as a "public official."

**B. Dominion Became a Public Figure by Thrusting Itself into Public Debate Over the Integrity of the 2020 Presidential Election.**

Dominion claims it did not become a public figure by its public-relations campaign described in Paragraphs 59 and 60 and notes 64 and 67 of its complaint because the campaign was

a "response" to adverse publicity that it attributes to Lindell. Opp. at 5. Even if Dominion began

its mammoth blitz as a response, its resort to publicity made it a "limited purpose public figure"

under the five District of Columbia precedents cited at pages 10-11 of MyPillow's Memorandum

in Support of Its Motion to Dismiss. The plaintiffs in those cases were far less central to public

controversies when they chose to defend themselves publicly than was Dominion when it began

its multi-million-dollar program that took it to the center of current media attention.

Both New York state court decisions that Dominion cites for its contention that it is not a

"limited purpose public figure" (Opp. at 5) present facts that are a world apart from the facts of

this case. In *Gottwald v. Sebert*, 2021 WL 1567070 (N.Y. App. Div. 1st Dep't, Apr. 22, 2021), the

plaintiff was an "established music producer" who "never injected himself into the public debate

about sexual assault or abuse of artists in the entertainment industry." *Id.* at *1, 4. The plaintiff in

*Greenberg v. CBS, Inc.*, 69 A.D.2d 693, 419 N.Y.S.2d 988 (2d Dep't 1979), was a doctor who

"did not invite or attempt to attract public attention" and who "merely published scientific articles

in medical journals intended for a scholarly audience and not for a mass market." *Id.* at 704, 705.

Neither decision helps Dominion escape "limited purpose public figure" status in this case.

### III.

### DOMINION DOES NOT PLEAD ANY BASIS TO HOLD MYPILLOW RESPONSIBLE FOR THE STATEMENTS BY LINDELL ALLEGED IN THE COMPLAINT.

The parties agree that corporate liability for an employee's allegedly defamatory statements

only exists where the defamatory statements are made ***within the scope of the employee's***

***employment* and *in furtherance of the company's business.*** Opp. at 23; *Wash. Gas-Light Co. v.*

*Lansden*, 172 U.S. 534, 546 (1899); *Dean v. Am. Fed'n of Gov't Emps.*, 509 F.Supp.2d 39, 58

(D.D.C. 2007). An employer must also have the "right to control and direct the [agent] in the

performance of his work" for liability to attach. *Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F.

Supp.3d 149, 175 (D.D.C. 2017) (citations omitted).

The allegations pleaded by Dominion fail to meet these standards. The complaint includes

conclusory statements that Lindell acted as MyPillow's agent, but rote repetition of the elements

of a claim does not satisfy the requirement that a plaintiff allege plausible facts to state the claim.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Even assuming the alleged facts cited by Dominion

(Opp. at 24) to be true, they would not make MyPillow legally responsible for Lindell's personal

opinions. These allegations tend to show, unsurprisingly, that the CEO of MyPillow is associated

with MyPillow. Marketing campaigns use repeated motifs or characters to establish familiarity and

recognition by the public, leading to identification of personalities such as the Verizon Guy or the

Progressive Insurance Gal with particular companies. This technique does not, however, convert

all public statements made by such personalities on any subject into statements attributable to the

companies with which the personalities are identified. Making political statements is not within

the scope of Lindell's employment as the CEO of a pillow company, and MyPillow does not

"control" or "direct" Lindell's First Amendment speech.

Nor do acts of third parties such as Fox News or consumers buying pillow products convert

Lindell's personal statements into statements of MyPillow. Neither does use of promo codes

adapted to be memorable for a particular audience impute responsibility to MyPillow for Lindell's

personal political activity. There is no allegation that MyPillow endorsed Lindell's statements or

that MyPillow authorized any speech regarding Dominion. At most Dominion's allegations imply

that Lindell capitalized on his association with MyPillow to promote his personal views. That is

not a basis for assigning defamation liability to MyPillow, even if MyPillow benefited from

increased sales as a result of Lindell's personal activities. It is well-established that corporate

executives may wear multiple hats, and their acts in one capacity do not make all their corporate employers liable. *See United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (directors of parent corporation do not subject parent corporation to liability for acts performed in capacity as directors of subsidiary corporation); *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp.2d 119, 134 & n.6 (D.D.C. 2004) (nonprofit corporation not subject to jurisdiction in D.C. on the basis of its officer's activities within D.C. performed for a different organization) (citing *Bestfoods*).

By imputing responsibility for Lindell's statements to MyPillow, a court would effectively compel employers to monitor and discipline their employees' expressions of personal opinions to avoid potential liability and legal costs. The specter of defamation liability would demand economic dissociation from any employee who contradicts prevailing conventional wisdom. This would subvert the ethos of the First Amendment and American ideals of expressive individualism and personal autonomy. It would compel uniformity, where individuals of different political views could not share a workplace unless one group muzzled itself. The chilling impact on free speech would be unprecedented. MyPillow has organized its affairs according to a different vision. The corporation chooses not to engage in political expression and refrains from controlling the political expression of its employees.  This is a choice the law permits, and the First Amendment protects.

Dominion cites cases from other jurisdictions in which corporate liability was sustained. Opp. at 23-24. In each of those cases the employee expressing a view was acting within the scope of employment: a newspaper editorial writer wrote an editorial published by the newspaper, a CEO spoke about the past CEO's effect on the corporation, an insurance adjuster spoke about a damage repair contractor's work, a corporate president spoke about a former vice president of the company's past actions as an employee. These decisions are not germane to whether a pillow company CEO was acting within the scope of his employment when he expressed opinions on an

election. More on point are decisions such as *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d

140 (4th Cir. 2018) (employee did not act within scope of employment when making statements

about the reason a co-worker was absent for work for medical treatment); *Mirage Ent., Inc. v. FEG

Entretenimientos S.A.*, 326 F. Supp.3d 26, 36 (S.D.N.Y. 2018) (corporation not liable for tweet of

its CEO and sole shareholder concerning cancellation of concert contracted by corporation).

## IV.

### ENFORCEMENT OF *NEW YORK TIMES v. SULLIVAN* REQUIRES IMMEDIATE DISMISSAL OF AN INSUFFICIENT COMPLAINT UNDER RULE 12(b)(6)

Dominion tries to avoid dismissal of its complaint under Rule 12(b)(6) by seeking refuge

in cases that grant plaintiffs broad latitude "at the pleadings stage" and by stating that its "burden

in alleging actual malice is not high." Opp. at 6-7, 21-23. This Court has, however, routinely

dispatched defamation claims on motions to dismiss based on plaintiffs' failure to plead actual

malice. *Tah*, 991 F.3d at 240 (affirming dismissal of defamation claim for failing to plead actual

malice, in light of "famously 'daunting'" actual malice standard); *Arpaio v. Zucker*, 414 F. Supp.3d

84, 91 (D.D.C. 2019) (granting motion to dismiss for failure to plead actual malice notwithstanding

that the allegedly defamatory statements "were not substantially true"); *Fairbanks v. Roller*, 314

F. Supp.3d 85, 92 (D.D.C. 2018) (granting motion to dismiss for failure to plead actual malice).

Other federal courts have done the same. *E.g., McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d

352, 359 (3d Cir. 2020); *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 26 (1st Cir. 2018); *Biro v.

Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015). *See Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d

106, 109 (D.C. Cir. 2017) ("To preserve First Amendment freedoms and give reporters,

commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the

truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation

suits."). For the reasons stated at pages 17-18 of MyPillow's Memorandum in Support of Its

Motion to Dismiss and persuasively articulated by Judges J. Skelly Wright, Brett Kavanaugh, and Judith Rogers in *Washington Post v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966), *Kahl*, 856 F.3d at 109, and *Farah*, 736 F.3d at 534, the "harassment of lawsuits," "costly and time-consuming defamation litigation," and "long and expensive litigation" must be deterred by "expeditiously weed[ing] out unmeritorious defamation suits" with "summary proceedings [that] are essential."

Dominion cites two Supreme Court precedents that are unpersuasive. *Hutchinson v. Proxmire*, 443 U.S. 111, 135-36 (1979), held that the plaintiff was not a public figure at all so the actual malice standard did not apply. *Lawrence v. Bauer Pub. & Printing Ltd.*, 459 U.S. 999 (1982), is a dissent from the denial of certiorari, not an opinion of the Supreme Court.

**V.**

**MYPILLOW'S SCANT ACTIVITY WITHIN THE DISTRICT OF COLUMBIA PROVIDES NO BASIS FOR THIS COURT TO EXERCISE JURISDICTION.**

MyPillow's small-scale ordinary business activities within the District of Columbia do not give this Court jurisdiction to hear and decide Dominion's defamation claim that bears no relation whatsoever to MyPillow's business. None of the three prongs of the D.C. long-arm statute invoked by Dominion is satisfied, and Dominion's citation of *Fisher v. Bander*, 519 A.2d 162 (D.C. 1986), is inapposite because it concerned a defendant who "purposefully directed his activities at plaintiffs within the forum state." *Id.* at 164. MyPillow did not "direct" Lindell's statements at all, and surely did not do so "within the forum state." This Court lacks jurisdiction because MyPillow's business activities in the District of Columbia are unrelated to Dominion's claims, and MyPillow is not responsible for Lindell's personal expressions of political views.

### A.  <u>The District of Columbia Long-Arm Statute Does Not Confer Jurisdiction.</u>

Dominion invokes three prongs of D.C.'s long-arm statute. None confers jurisdiction.

19

**(1)** **Section 13-423(a)(1).** To establish jurisdiction under D.C. Code § 13-423(a)(1), a plaintiff must allege (a) that the defendant engaged in business-related activity within the District *and* (b) that the plaintiff's claims arise from these activities. *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp.3d 95, 110-11 (D.D.C. 2018); *Brunson v. Kalil & Co.*, 404 F. Supp.2d 221, 228 (D.D.C. 2005). None of the alleged MyPillow business transactions (Opp. at 28) gave rise to any legal claim, including Dominion's defamation claim against MyPillow. Dominion relies heavily on MyPillow's sponsorship of a few events in D.C. at which Lindell appeared. Sponsorship of an event, however, does not confer jurisdiction over a non-resident. *Citadel Inv. Grp., L.L.C. v. Citadel Cap. Co.,* 699 F. Supp.2d 303, 310 (D.D.C. 2010) ("attendance at and sponsorship of a trade show is not, without more, sufficient to confer jurisdiction over a non-resident defendant."). *See also C.S.B. Commods., Inc. v. Urban Trend (HK) Ltd.,* 626 F. Supp.2d 837, 853 (N.D. Ill. 2009); *Jung*, 300 F. Supp.2d at 134. Sales of pillows have no discernable relationship or liability-anchoring connection to commentary at a political rally. A CEO's personal political speech in a locality does not give that locality's courts jurisdiction over his employer. The sponsor of an event is not liable for torts committed by attendees at the event. *See Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1051, 934 P.2d 121, 132 (1997); *Vogel v. W. Mountain Corp.*, 97 A.D.2d 46, 47–48, 470 N.Y.S.2d 475, 476 (3d Dep't 1983); *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003) (sponsorship of website; superseded by statute on other grounds); *Matson v. Dvorak*, 40 Cal. App. 4th 539, 549, 46 Cal. Rptr. 2d 880, 886-87 (1995) (contributor not liable for campaign publication).

The precedents cited by Dominion are demonstrably distinguishable. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021), and *Quality Air Servs., L.L.C. v. Milwaukee Valve Co.*, 567 F. Supp.2d 96 (D.D.C. 2008), were product-liability actions, in which the defendants' sales of their products were sufficient grounds for jurisdiction over the defendants

*for claims that the products were defective.* There was a direct connection between the defendants' business activity in the jurisdiction and the claims brought there against the defendants. (*Ford* explicitly noted that the claim must "arise out of or relate to the defendant's contacts with the forum." 141 S. Ct. at 1026 (emphasis removed)). *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320 (D.C. 2000), was a personal-injury case in which a defendant that advertised within the District of Columbia was held to be within the court's jurisdiction for a personal-injury claim by a plaintiff who traveled to the defendant's store. Dominion's attempted reliance on *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp.2d 116 (D.D.C. 2010), is misplaced because that decision addressed jurisdictional arguments under subsection (a)(4) of the statute, not subsection (a)(1). *Id.* at 122-23.

Nor is Dominion correct in citing *IMAPizza, supra*, for the proposition that satisfaction of the Due Process Clause test "necessarily" satisfies the "arising from" requirement in § 13-423(a). Opp. at 30. In *IMAPizza*, there was a clear logical link between the local contact and the plaintiff's claim. The defendant's travel to D.C. was an "indispensable" part of planning to open a pizza restaurant, and the plaintiff alleged that the planned restaurant would infringe plaintiff's intellectual property rights. The question in *IMAPizza* was whether the *degree* of contact satisfied the "arising from" language in the statute conferring jurisdiction. 334 F. Supp.3d at 113-14. In this case the question is not *degree*; it is whether the *kind* of contact between MyPillow's business and the defamation claim satisfies the "arising from" test. It does not.

**(2)** **Section 13-423(a)(3).** Dominion also argues that jurisdiction for its claims against MyPillow may be based on section 3 of the long-arm statute, which bestows jurisdiction over claims arising from the defendant's causing tortious injury in the District of Columbia by an act in the District of Columbia. Opp. 31-32. No "act" committed in the District of Columbia by MyPillow – which only sold its product and sponsored rallies in D.C. – caused the alleged injury to Dominion.

Lindell's personal political statements are not an "act" of MyPillow. The acts of a corporate officer in a capacity distinct from service as the corporation's officer do not create jurisdiction over the corporation. *See Jung*, 300 F. Supp.2d at 134 & n.6; *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 853 (6th Cir. 2017); *Seltzer v. I.C. Optics, Ltd.*, 339 F. Supp.2d 601, 611 (D.N.J. 2004). *See also* Part III, *supra*. Hence § 13-423(a)(3) provides no basis for D.C. jurisdiction over MyPillow in a defamation action.

**(3)** **Section 13-423(a)(4).** Dominion's complaint fails to allege that MyPillow caused any injury to Dominion in the District of Columbia by an act outside the District, or that MyPillow regularly does or solicits business, engaged in a persistent course of conduct within the District of Columbia, or derived substantial revenue from goods used or consumed in the District. Dominion's Opposition does not even attempt to identify such an allegation in the complaint. See Opp. at 33. The complaint notably fails to allege that Dominion does any business within the District that could have been harmed. *See* Compl. ¶¶ 154-59.

This Court has defined "persistent course of conduct" to require "continuous corporate operations . . . so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Burman v. Phoenix Worldwide Indus., Inc.*, 437 F. Supp.2d 142, 153 (D.D.C. 2006). This is comparable to a requirement of "fairly extensive" contacts, and .15% of a company's revenue has been deemed insufficient. *Id*. MyPillow's sponsorship of a few rallies on a one-time (not continuous) basis, in a jurisdiction where it derives less than .1% of its revenues, is not a "persistent course of conduct" that justifies suit against it on claims unrelated to its sales. If § 13-423(a)(4) were construed so broadly as to encompass Dominion's claims against MyPillow in this action, this section would effectively

become a back-door grant of general jurisdiction, subverting the policy of limiting general jurisdiction to states with particular connections to a corporation.[14]

**B. <u>Due Process Bars D.C. Jurisdiction over Dominion's Claims Against MyPillow.</u>**

Dominion's complaint also fails to show that the exercise of specific jurisdiction over MyPillow would be consistent with the Due Process Clause of the Fourteenth Amendment. For the exercise of jurisdiction to be consistent with the due process clause, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) ("purposeful availment" means "a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts"). "[T]he touchstone of personal jurisdiction is the reasonable expectation that a person might be sued in a particular forum." *Maryland Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp.3d 80, 91 (D.D.C. 2019). A minimum-contacts analysis "focuses on the relationship among the defendant, the forum, and the litigation." *Fiorentine v. Sarton P.R., LLC*, 486 F. Supp.3d 377, 385 (D.D.C. 2020). There is no relationship creating a reasonable expectation of a defamation lawsuit in D.C. between (a) a Minnesota-based pillow company, (b) a Colorado-based plaintiff, (c) the District of Columbia, and (d) a defamation claim based on expressions of personal political opinion by the pillow company's C.E.O. – particularly when nearly all the allegedly defamatory statements were made outside the District of Columbia. A small amount of

---

[14] Maintaining a website accessible in a locality does not create personal jurisdiction there. *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C.Cir. 2000) ("[P]ersonal jurisdiction surely cannot be based solely on the ability of District residents to access the defendants' websites, for this does not by itself show any persistent course of conduct by the defendants in the District.").

pillow sales and advertising in D.C., unrelated to the defamation claims, is the very type of "attenuated contact" proscribed as a basis for jurisdiction by *Burger King*.

## VI.

### THE DISTRICT OF COLUMBIA IS NOT THE PROPER VENUE FOR A DISPUTE BETWEEN A MINNESOTA PILLOW MANUFACTURER AND A COLORADO ELECTION-SERVICE PROVIDER

Dominion implicitly concedes that the usual considerations do not support venue for this lawsuit in the District of Columbia. The court's familiarity with applicable law does not. Convenience of the parties or witnesses does not. Ease of access to sources of proof does not. Relative congestion of court calendars does not. Local interest in the controversy does not.

Nor does Dominion dispute that the applicable standard for a change of venue was declared in *Preservation Soc. of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp.2d 49, 53 (D.D.C. 2012), which was cited and applied in MyPillow's Mem. at 28-30. Instead, Dominion discusses various aspects of the *Preservation Soc. of Charleston* test (Opp. at 36-38) and argues that venue is proper in the District of Columbia because, it alleges, a "substantial part of the events" occurred here. Opp. at 37. However, Dominion does not deny that at most six of the twenty-seven defamatory statements alleged in the complaint occurred in D.C. *See* MyPillow Mem. at 27. It chooses to muddle the venue issue by emphasizing events that occurred in the District but are unrelated to Dominion's defamation claim such as MyPillow advertising, sales, and the January 6, 2021 actions at the Capitol. Dominion alleges a "defamatory campaign . . . centered in Washington, D.C." (Opp. at 36-39) even though the vast majority of the allegedly defamatory statements it alleges were not made in the District.

These fragments fail to justify venue in the District of Columbia. *First*, MyPillow made no statements concerning Dominion, and no plausible fact alleged in the complaint makes it responsible for Lindell's statements. *See* Part III, *supra*. *Second*, "substantial" means "a

considerable portion of the events," *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp.3d 158, 190 (D.D.C. 2018) (citing *Perlmutter v. Varone*, 59 F. Supp.3d 107, 110 (D.D.C. 2014)), not ***any fraction***. In *Cockrum*, allegations that meetings within D.C., several emails sent or received within D.C., and allegations of additional conspiratorial activity possibly within D.C. were not sufficient to justify venue in D.C. because the primary locus of the alleged conspiratorial activity was in New York. In this case, allegations that a fraction of the alleged defamatory statements were made in D.C. do not amount to "a considerable portion of the events." That conclusion follows whether or not Lindell's personal statements are imputed to MyPillow.

Applying *Preservation Soc.* properly, a few of the cited factors favor neither D.C. nor Minnesota. At least two factors favor transfer to Minnesota. *First*, Dominion chose to bring a claim under Minnesota law. Though it attempts to wave away its own claim as "secondary," (Opp. at 38), the Federal Rules make no provision for classifying claims as "secondary." If Dominion did not want this claim to affect its action, it should not have brought the claim. A party that seeks to benefit by bringing a claim must bear the consequences of bringing that claim and may not selectively choose only consequences it prefers. *Second*, Minnesota is MyPillow's choice of venue as the location of its operations, as well as its directors and employees who may be witnesses.

The ***only*** factor that weighs in favor of venue in D.C. is Dominion's selection of D.C. as the location to bring its action. However, MyPillow noted what Dominion does not deny: the decided cases hold that a plaintiff's choice of forum loses its force if the plaintiff is not a resident of its chosen forum and most of the relevant events occurred elsewhere. *See* MyPillow Mem. at 29. That is exactly the circumstance here. Since Dominion cannot provide any legitimate basis for venue in the District of Columbia, the governing law requires that, unless Dominion's claims are dismissed under Rule 12(b)(6), the case be transferred to the District of Minnesota.

DATED:  June 18, 2021                    **LEWIN & LEWIN, LLP**

By */s/ Nathan Lewin*
    Nathan Lewin (D.C. Bar No. 38299)
    888 17th Street NW
    Fourth Floor
    Washington, DC 20006
    Telephone: (202) 828-1000
    nat@lewinlewin.com

*Counsel for Defendant My Pillow, Inc.*

**PARKER DANIELS KIBORT LLC**

By */s/ Andrew D. Parker*
    Andrew D. Parker (MN Bar No. 195042)*
    Joseph A. Pull (D.C. Bar No. 982468)
    Gregory N. Arenson (MN Bar No. 398276)*
    888 Colwell Building
    123 N. Third Street
    Minneapolis, MN 55401
    Telephone: (612) 355-4100
    Facsimile: (612) 355-4101
    parker@parkerdk.com
    pull@parkerdk.com
    arenson@parkerdk.com

   *Admitted Pro Hac Vice

   *Counsel for Defendant My Pillow, Inc.*

By */s/ Alan Dershowitz*
    Alan Dershowitz (MA Bar No. 121200)
    1575 Massachusetts Avenue
    Cambridge, MA 02138

*Of Counsel for Defendant My Pillow, Inc.*